**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GARY BLUNT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 04-0124-CG-M** |
| | ) | |
| **CHRISTOPHER TOMLINSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the court on the motion of Christopher Tomlinson and the City of Mobile Police Department for summary judgment (Doc. 79), plaintiff's opposition thereto (Doc. 88), and defendants' reply (Doc. 89).  The court finds that the City of Mobile Police Department is not a legal entity subject to suit and that Officer Tomlinson is entitled to qualified immunity.  Therefore, defendants' motion for summary judgment is due to be granted.

## FACTS

Plaintiff, Gary Blunt, filed this case seeking compensation for injuries he received during a confrontation on February 23, 2002 between himself and a police officer for the City of Mobile, Christopher Tomlinson.

Officer Tomlinson gave the following account of what happened on the morning of February 23, 2002:

> [W]hile conducting routine patrol I observed a maroon Buick backed up to the side doors of a business and an unknown black male squatting at the trunk. Because I knew that the business was normally closed at this time, and that there had been previous burglaries in the area, I stopped to investigate.  As I approached the vehicle I observed a chain extending from the trunk to the

undercarriage of the vehicle.  I made contact with the black male who was later identified as Gary Blunt.  Mr. Blunt stated he was having car problems and walked to the driver's door.  I ordered Mr. Blunt to stop and conducted a pat down during which time I felt a screwdriver inside Mr. Blunt's clothing. While patting Mr. Blunt down, I observed the doors of the business had been damaged. At that point I attempted to detain him.

Mr. Blunt tried to break free of my grip but was unable to do so. He then began swinging his closed fists at me and striking me with his closed fists. I attempted to subdue him. During the struggle Mr. Blunt made various comments including that he would kill me.

While attempting to subdue Mr. Blunt, he broke free and ran back toward the car. I grabbed him and brought him to the ground. During this time the vehicle drove off.  I was unaware that anyone else was there inside the car, or in the immediate vicinity, until the vehicle drove away. Mr. Blunt continued to struggle and strike me. I finally subdued Mr. Blunt, and he ceased struggling and striking me. At that time Lt. Gill, of the Mobile Police Department arrived on the scene. I indicated to Lt. Gill that I had the situation under control and that he should pursue the vehicle. When I attempted to place handcuffs on Mr. Blunt he rolled away and broke my grip on him. He tried to run away but I stopped him. He again began swinging his closed fists at me and striking me, and I once again attempted to subdue him.

As I attempted to subdue Mr. Blunt, I felt my duty belt being pulled around my waist from the side to the front. When I looked down, Mr. Blunt had grasped both hands around my weapon and was attempting to remove it from my holster. I attempted to break Mr. Blunt's grasp on my weapon and I ordered him to release it. Mr. Blunt refused to release his grasp on my weapon and I was unable to break his grasp. I felt my weapon being pulled out of the holster.  I attempted to subdue Mr. Blunt by pulling him to the ground. When we fell to the ground I felt my holster and it was empty. At that point I believed Mr. Blunt had my weapon and was about to shoot me. I removed my back-up weapon from my ankle holster and fired twice. Mr. Blunt then began running away. Back-up officers arrived at the scene and we were able to locate and handcuff Mr. Blunt.

(Tomlinson Affid.).

In contrast, Gary Blunt gave the following account of the incident in his affidavit:

On and about February 23, 2002, I was shot by Mobile Police Officer Christopher Tomlinson, who had Blunt pinned down on the ground and restrained. I was placed under arrest by Officer Tomlinson, and at all times this Officer was loud, making comments about he was tired of this "Shit" and it all ends here this night.

I asked Officer what are you talking about. In response it was a loud gun shot and I was shot by this Officer for no reason at all. I struggled to get free, I remember this Officer making a call on his radio, that he had the suspect in custody, and that the other suspect was driving away. I was at no time fighting, resisting arrest, and I was explaining at all times that I had not did any crime, that I was working on my car, which I had just placed a nut to hold the tie rod on the car for it to be steered again. I had a chain in the car which was true, and that chain was there for the purpose to pull my car home if I had to.

There was no instruments which were found on my person which damaged nor any burglary tools found that could give any evidence connecting to an alleged burglary which was supposed to have been the basis for the arrest.

Blunt was not shot until Officer Gill had left the scene, and again it was all about this "shit" going to end tonight, and officer shot Blunt. I was in custody when Officer Gill was present, and there was no need for Officer Tomlinson to make the very first shot, and it was no need for any pursuit where Blunt was already down and restrained.

Officer Tomlinson lied in his affidavit saying that I struggled with him and took his gun, and he removed his back uo weapon and shot, Blunt. It was a full plan evil thought of Officer Tomlinson to kill Blunt, and then to put a gun down. I pushed and ran, and I heard police cars coming, and I was hollering for help, because I knew at all times that Officer Tomlinson, wanted to kill, Blunt. I never took any gun, and there exist no finger prints which proves that a gun was placed in the palm of Blunt's hands.

(Doc. 67-5 - Blunt Affid.).

After the incident, Sergeant Mark Ward and Corporal Glen Garside interviewed Mr. Blunt on February 26, 2002, while Blunt was at the hospital recovering from his injuries. (Doc. 80 Attachment #3).  Mr. Blunt had not received, nor asked for, any pain medications on February 26, 2002. (Ward Affid. p. 2).  The only medication Blunt received that day was antibiotics. (Id.).  According to the recorded statement, Mr. Blunt had been smoking crack for two or three days before the incident (Doc. 80 Attachment #3 at p. 3).  Mr. Blunt, who has had a crack problem for about three years, reported that he bought $400 or $500 worth of crack two days before the incident and was given two quarter rocks from the man that rented his car. (Id. at p. 5).  Mr. Blunt admitted that he occasionally smokes so much crack that he blacks out and does not remember and can lose weeks at a time. (Id. at pp. 8-9).  Until the officers told Blunt who had

3

shot him, Blunt stated that he thought the man that had rented his car was the one he had a

confrontation with and that shot him. (Id. at p. 4).

At his deposition, Mr. Blunt testified that on the day of the incident, he came out from

under the car and someone started beating him about the head. (Blunt Depo. p. 39).  Blunt

thought the person that was beating him was Melvin Pettaway, also known as "Bear" who was

with Blunt at the car. (Id. at pp. 39, 44).  Blunt testified that he did not know at the time that any

police officers were there and only found out later when Detective Garside told him. (Id. at pp.

39, 43).  Blunt admitted that when the car was later recovered it had stolen property in it and that

he later pled guilty to charges regarding the stolen property. (Id. at pp. 25, 45).  Blunt also

admitted that he attempted to run from Officer Tomlinson three times before his arm was twisted

behind him and that it was after this third time that he was shot. (Id. at pp. 59-60).  Blunt stated

that there were some incorrect statements in his affidavit because he filed the paperwork to try to

meet a deadline and an inmate had told him he could amend or change it later. (Id. at pp. 43-44).

A toxicology report for Mr. Blunt, dated February 27, 2002 (the day after the incident),

indicates that Blunt's blood was positive for traces of cocaine. (Doc. 80 Attachment #4).


**LEGAL ANALYSIS**

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted:

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."   The trial court's function is not "to

weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).   "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" <u>Bailey v. Allgas, Inc.</u>, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>See</u> <u>Anderson</u>, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. <u>O'Ferrell v. United States</u>, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999).   "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." <u>Miranda v. B&B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing <u>Mercantile Bank & Trust v. Fidelity & Deposit Co.</u>, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 524 (11th Cir. 1994)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a

genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the

[non-moving] party's position will not suffice; there must be enough of a showing that the jury

could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)

(citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences

in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir.

1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).


**B. Plaintiff's Claims**

        Plaintiff's original complaint asserted claims against Officer Christopher Tomlinson and

the City of Mobile Police Department for the injuries he received when he was shot by

Tomlinson. (Doc. 1).  Plaintiff filed an amended complaint on this court's § 1983 form listing the

name of the defendants in the heading as "Christopher Tomlinson, Et al" which could possibly

include the City of Mobile Police Department.   However, within the body of the form

complaint, when asked to list the defendant(s), plaintiff only listed Christopher Tomlinson.  As

such, the City of Mobile Police Department contends that they are not named defendants in this

action.  As defendants point out, even if the City of Mobile Police Department was a named

defendant, it is not an entity that can be sued. Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir.

1992) ("[P]olice departments are not usually considered legal entities subject to suit.").  In

Alabama, a city's police department is not a suable entity or a proper party under state law or for

§ 1983 purposes. Hawkins v. City of Greenville, 101 F.Supp.2d 1356, 1363 (M.D. Ala. 2000);

accord Lee v. Wood, 2007 WL 2460756, at *7 (S.D. Ala. Aug. 27, 2007) (finding that the City of

Mobile Police Department is not a suable entity under state law); Pierre v. Schlemmer, 932

F.Supp. 278, 279-80 (M.D. Fla. 1996) (finding the Eleventh Circuit adheres to the approach that

a city police department is not a separate legal entity which is subject to suit and is not a

"person" for § 1983 purposes); Eddy v. Miami, 715 F.Supp. 1553, 1556 (S.D. Fla. 1989) ("Where a police department is an integral part of the city government as the vehicle through which the city government fulfills its policing functions, it is not an entity subject to suit."); Reese v. Chicago Police Dept., 602 F.Supp. 441, 443 (N.D. Ill. 1984) (finding a police department does not have a legal existence separate from the city and, therefore, is not a suable entity). Thus, to the extent plaintiff has asserted a claim against the Police Department, it is due to be dismissed, because it is not a suable entity under Alabama law or a "person" for § 1983 purposes.

Even if plaintiff's complaint could be construed to assert a claim against the City of Mobile, plaintiff has failed to support such a claim. In order to state a claim under § 1983 against the City of Mobile, plaintiff must allege that he suffered a constitutional injury, and that his injury was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 (1978). A municipality cannot be held liable under §1983 solely because it employs a tortfeasor. Id. at 2035. Plaintiff has offered no allegation or evidence regarding any policy statement, ordinance, regulation, or decision of the City.[1] Thus, to the extent plaintiff intended to assert claims against the city, those claims are due to be dismissed.

As to plaintiff's claims against Officer Tomlinson, Tomlinson asserts that he is entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly

---

[1] Plaintiff has also failed to support any possible state law claims against the City. Under Alabama law, the liability of a municipality is limited to injuries suffered through "neglect, carelessness or unskillfulness." ALA. CODE § 11-47-190; Franklin v. City of Huntsville, 670 So.2d 848, 852 (Ala. 1995). A municipality can be held liable "where the officer committing the alleged assault or battery was unskilled as a consequence of inadequate training or supervision of the municipality." Nolin v. Town of Springville, 45 F.Supp.2d 894, 914 (N.D. Ala. 1999), reversed on other grounds, 207 F.3d 1253 (11th Cir. 2000). However, there has been no allegation or evidence that the actions of Officer Tomlinson were the result of unskillfulness caused by inadequate training or supervision.

established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).  Here, it is clear that Officer Tomlinson was acting within the course and scope of his discretionary authority in stopping to investigate and deciding to detain the suspect.  Plaintiff has offered no evidence or even alleged that Officer Tomlinson's stop was anything other than a routine police stop. "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

In considering the merits of a qualified immunity defense in excessive force cases, courts previously considered whether the right was clearly established and, if so, whether, in light of such clearly established law, a reasonable officer could have known that his/her conduct was unlawful. See Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001) (citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  However, the Supreme Court revisited the above analysis, clarifying the sequence of inquiries for qualified immunity cases. Id.

The Supreme Court held in Saucier that a qualified immunity analysis must begin with the threshold determination of whether, based upon the facts taken in the light most favorable to the party asserting the injury, the officer's conduct violates a constitutional right. Id. at 201;

8

Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508 (2002).  If no constitutional right was violated, the court need not inquire further.  Id.  If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established.  Id.

In considering the first step of Saucier's two-step qualified immunity inquiry, we must determine whether plaintiff's constitutional right to be free from excessive force was violated Under the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the circumstances.  Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  The court, in making this determination, must presume that the plaintiff's version of events is true.  See Hope, 536 U.S. at 736 (The threshold inquiry is "whether plaintiff's allegations, if true, establish a constitutional violation." emphasis added).  The Supreme Court described the "objectively reasonable" standard to be applied in such excessive force cases as follows:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. Id., at 8, 105 S.Ct., at 1699, quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).  Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S.[1], at 22-27 [(U.S. Ohio 1968)], 88 S.Ct. [1868], at 1880-1883 [(1968)].  Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner, 471 U.S. [1], at 8-9 [(1985)], 105 S.Ct.[1694], at 1699-1700 [(1985)] (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, 392 U.S., at 20-22, 88 S.Ct., at 1879-1881. . . .   With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d [1028], at 1033 [(2d Cir. 1973)], violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers

are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978); see also Terry v. Ohio, supra, 392 U.S., at 21, 88 S.Ct., at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, 436 U.S., at 138, 98 S.Ct., at 1723, citing United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Graham, 490 U.S. at 396-397, 109 S.Ct. at 1871-1872.  "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand" Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir.2002) (internal quotation marks omitted).  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205.

If the court determines that defendants violated plaintiff's Fourth Amendment rights, the court must then turn to the second step in the analysis, whether those rights were clearly established.  Even if the court were to hold that the officers violated the Fourth Amendment, the officers are still entitled to immunity if their actions resulted from reasonable mistakes as to the legality of their actions. Id. at 206.  "[T]he law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  The plaintiff may not discharge his burden "by referring to general rules and to the violation of abstract 'rights'." Id. at 1150.  Qualified immunity is evaluated on the basis of what the official knew at the time of the challenged action, not "by hindsight, based on later

10

events." Id. at 1150.  A plaintiff can establish that the state of the law provided clear notice or warning to the officers that the conduct was unconstitutional by submitting fact-specific precedents, or demonstrating that the very conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting Lee, 284 F.3d at 1199).

In this case, plaintiff claims that Officer Tomlinson began beating him about the head as soon as plaintiff came out from under the car he was working on.  Plaintiff admits that he tried to get away from and ran from the officer at least three times.  Although he denies reaching for the officer's gun and says Tomlinson made comments like "this shit is going to end tonight," plaintiff was under the influence of crack cocaine at the time and either has very little or jumbled memory of the incident or was not lucid enough at the time to comprehend that the man he was fighting with was a police officer.  He also admits that some of the statements in his affidavit are incorrect.  In fact, some of the statements in plaintiff's affidavit are inconsistent with his deposition testimony.  The plaintiff stated in his affidavit that Officer Tomlinson made a call on his radio stating that he had the suspect in custody and that Tomlinson did not shoot plaintiff until Officer Gill left the scene.  Yet, the plaintiff testified at his deposition that he did not know that Officer Gill was at the scene or that the person he was struggling with was a police officer.  Plaintiff also claims he did not struggle with Tomlinson but admits that he broke away from his hold and ran from him three times.   Regardless whether the plaintiff actually reached for the officer's gun, the officer apparently believed that plaintiff had his hands on his weapon.  As stated above, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-397, 109 S.Ct. at 1872.  Under the circumstances, it was clearly reasonable for the officer to believe that deadly force was necessary.  Officer Tomlinson was attempting to apprehend a suspect who he had reason to believe may have been engaged in

the commission of a felony.  Blunt actively resisted arrest and attempted to flee from Officer Tomlinson and presented an immediate threat to the officer's safety.  Although plaintiff asserts that Tomlinson was a "malicious vigilante, whose sole purpose was evil intent," the only evidence of that fact is plaintiff's affidavit statement that the officer began hitting him immediately while yelling comments that "this shit was going to end tonight."  Since plaintiff has admitted that statements in his affidavit are incorrect and the evidence shows that he was under the influence of crack cocaine at the time of the incident, and that he either has an unclear memory of the event or was not fully cognizant at the time of what was going on, the court finds such evidence of malicious intent should be disregarded, especially since the plaintiff did not even know who it was that he was struggling with.  The court finds there is insufficient evidence for a fact finder to find that Officer Tomlinson acted maliciously or in bad faith.[2]  Moreover, as stated above, an officer's evil intentions will not make an objectively reasonable use of force unconstitutional.  <u>Graham</u>, 490 U.S. at 397, 109 S.Ct. at 1872.  The court finds that under the circumstances presented, a reasonable officer might believe that the level of force used was necessary in the situation at hand.  Therefore, the court does not find that the force used was excessive under the circumstances.

Even if the force used was found to be excessive, Officer Tomlinson is still entitled to immunity if his actions resulted from reasonable mistakes as to the legality of his actions.  The court finds that the law was not so concrete and factually defined to make it obvious to Officer

---

[2] The court notes that this case is set for bench trial and that if this case were to go to trial, the undersigned would be the ultimate fact finder.  "Although, as always, a district court must be aware that assessments of credibility come into sharper focus once live witnesses are heard, <u>Nunez [v. Superior Oil Co.</u>, 572 F.2d 1119 (5th Cir. 1978)] establishes that even at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result."  <u>Matter of Placid Oil Co.</u>, 932 F.2d 394, 398 (5th Cir. 1991).  The court in a non-jury case such as this is entitled to draw inferences from the undisputed facts in considering the disposition of the case as a matter of law when it finds that, as is it does here, a trial on the merits would reveal no useful additional information. <u>Nunez</u>, 572 F.2d at 1123-1124 (5th Cir. 1978).

Tomlinson that what he was doing violated federal law.  Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  The court finds that it would not be obvious to all reasonable government actors, in Officer Tomlinson's place, that what he is doing violates federal law.  The unlawfulness of the conduct was not readily apparent.  Therefore, summary judgment is due to be granted in Tomlinson's favor.

## CONCLUSION

For the reasons stated above,  the motion of Christopher Tomlinson and the City of Mobile Police Department for summary judgment (Doc. 79) is **GRANTED**.

**DONE and ORDERED** this 1st  day of April, 2009.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE